```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
```

| | |
|---|---|
| JOSEPH WOLSKI and<br>CHRISTINA WOLSKI,<br><br>    Plaintiffs,<br><br>    v.<br><br>GARDNER POLICE DEPARTMENT,<br>ERIC MCAVENE, DANIAL WILDGRUBE,<br>MICHAEL TRAVERS, and<br>MATTHEW PRESCOTT,<br><br>    Defendants. | CIVIL ACTION<br>NO. 18-12631-WGY |

YOUNG, D.J.              September 7, 2021

**MEMORANDUM & ORDER**

## I. INTRODUCTION

In theory, qualified-immunity summary-judgment cases are "a tug-of-war . . . between who gets the benefit of the doubt: summary judgment requires absolute deference to the nonmovant's factual assertions, while qualified immunity demands deference to the reasonable, if mistaken, actions of the movant." Justiniano v. Walker, 986 F.3d 11, 27 (1st Cir. 2021) (quotations omitted); see Ortiz-Resto v. Rivera-Schatz, CIVIL ACTION NO. 17-02362-WGY, 2021 WL 2555488, at *3-4 (D.P.R. June 22, 2021) (recognizing "the complexity of deciding qualified immunity at the summary judgment stage").

In reality, this tug-of-war can result in a "super-summary judgment" standard: "[e]ven when an official is not entitled to summary judgment on the merits -- because the plaintiff has stated a proper claim and genuine issues of fact exist -- summary judgment can still be granted when the law is not reasonably clear." Jamison v. McClendon, 476 F. Supp. 3d 386, 405 (S.D. Miss. 2020) (quotations omitted) (quoting Mark R. Brown, The Fall and Rise of Qualified Immunity: From Hope to Harris, 9 Nev. L.J. 185, 195 (2008)); see, e.g., Wilson v. Layne, 526 U.S. 603, 614-18 (1999).

This case aptly illustrates the point. The undisputed facts show that Massachusetts State Police trooper Matthew Prescott ("Prescott") violated the Fourth Amendment rights of plaintiffs Joseph Wolski and Christina Wolski (collectively, the "Wolskis"). "But owing to a legal deus ex machina -- the 'clearly established' prong of qualified-immunity analysis -- the violation eludes vindication." See Zadeh v. Robinson, 928 F.3d 457, 478-79 (5th Cir. 2019) (Willett, J., concurring in part and dissenting in part), cert. denied, 141 S. Ct. 110 (2020).

### A. Undisputed Facts

On January 20, 2016, Prescott and two other Massachusetts State Police troopers, Michael Travers ("Travers") and Danial Wildgrube ("Wildgrube"), traveled to the City of Gardner to

[2]

begin a homicide investigation. Defs.' Joint Statement Undisputed Facts ("Defs.' SOF") ¶ 9, ECF No. 88. During the investigation, Francis Arbolay ("Arbolay") and his stepbrother Thomas Racine ("Racine") became persons of interest. Id. ¶ 10. Joseph Wolski, then an officer with the Gardner Police Department, offered to help locate Arbolay, explaining that he had a rapport with Racine. Id. ¶ 11. Joseph Wolski soon located Racine and interviewed him in the Gardner Police Station. Id. ¶ 13. During this recorded interview, Racine asked another police officer to leave the room so that Racine could speak with Joseph Wolski alone. Id. ¶¶ 14-15. Racine then asked to use Joseph Wolski's cell phone, a request which Joseph Wolski granted. Id. ¶ 15. Racine typed into the cell phone and gave it back to Joseph Wolski to read. Id. ¶¶ 15-16. Joseph Wolski read the message and told Racine that he would delete it. Id. ¶ 16. Joseph Wolski deleted the message and did not tell anyone at the Gardner Police Department what had happened. Id. ¶ 17. Joseph Wolski "normally used his personal cell phone to communicate with the informants he utilized as part of his job with the Gardner Police Department." Pls.' Joint Statement Undisputed Facts ("Pls.' SOF") ¶ 13, ECF No. 102.

The District Attorney's Office indicted Arbolay for homicide. Defs.' SOF ¶ 20. The Massachusetts Superior Court

sitting in and for the county of Worcester later allowed Arbolay's motion to compel the preservation and production of "all field, investigation, and/or other notes or communications -- written, electronic, or otherwise -- generated by or between law enforcement officials or any other agents of the Commonwealth during response to and investigation of the incident that gave rise to this case." Defs.' Joint Mot. Summ. J. ("Defs.' Mot."), Ex. F, Mot. Preserve & Provide Police Notes ("Superior Court Order"), ECF No. 87-6.

An Assistant District Attorney subsequently asked Wildgrube "to ensure the extraction of the data from the cell phones of all investigators . . . ." Defs.' SOF ¶ 22. Wildgrube, in turn, assigned Prescott to conduct a data extraction of approximately nine cell phones belonging to various officers of the Massachusetts State Police Department and Gardner Police Department. Id. ¶¶ 23-26. Lieutenant Eric McAvene ("McAvene"), who was third in command at the Gardner Police Department, Pls.' SOF ¶ 15, summoned Joseph Wolski and "inform[ed] [him] of the [Superior] Court's Order for his cell phone," Defs.' SOF ¶¶ 28-29, to which he responded by "hand[ing] over [his] personal cell phone to defendant McAvenue [sic]," Aff. Pl. Joseph Wolski ¶ 16, ECF No. 104. Joseph Wolski explained, however, that the cell phone he "currently had wasn't even the same phone [he] had used during [his] involvement with the Arbolay matter and the Racine

[4]

interview -- [his] wife and [he] had upgraded since that time, and [he] didn't even think it had the same phone number." Id. ¶ 15. McAvene then gave Joseph Wolski's cell phone to Travers, "who left the room with it for about 45 minutes," id. ¶ 17. Travers gave Joseph Wolski's cell phone to Prescott, who conducted the data extraction. Defs.' SOF ¶ 30.

To conduct the data extraction, Prescott used Cellebrite, a software installed on his laptop. Defs.' Mot., Ex. D, Aff. Def. Matthew Prescott ("Prescott Aff.") ¶ 8, ECF No. 87-4. Prescott is a "trained specialist in computer and cell phone extractions" who has conducted more than 500 cell phone extractions for the Massachusetts State Police Department. Id. ¶ 4. He has "completed numerous training opportunities and received certifications in the area of processing computers and cell phones," and he also has "obtained a certification to extract information from computers and cell phones using the Cellebrite software." Id. Cellebrite "does not provide an option to pick which data [are] extracted during the process," meaning that data extractions through Cellebrite copy the entire "file system, which includes all the data on the phone." Defs.' SOF ¶ 23. After conducting the data extraction, Prescott returned Joseph Wolski's cell phone to him, left the Gardner Police Department, gave a copy of the data to Travers on a disc, did not copy or share the data again, and deleted the data from his

[5]

laptop hard drive at the conclusion of the Arbolay case. Prescott Aff. ¶¶ 11-15.

The Wolskis kept consensually taken photographs of their sexual activity (the "intimate data") in a "locked photo album vault" on Joseph Wolski's personal cell phone. Pls.' SOF ¶¶ 31, 33; Remote Dep. Christina Wolski 59:17-19, ECF No. 87-7. Prescott's data extraction extended into this locked photo album vault. Pls.' SOF ¶ 39. McAvene later learned of and told other Gardner Police Department officers about the intimate data, id. ¶¶ 39-41, and word subsequently spread further in the Gardner Police Department, id. ¶ 43.

### B. Procedural History

In December 2018, the Wolskis filed the operative complaint for invasion of privacy in violation of 42 U.S.C. § 1983 (count I), conspiracy to interfere with civil rights in violation of 42 U.S.C. § 1985 (count II), negligent training and supervision in violation of the Massachusetts Tort Claims Act (count III), crimes against chastity, morality, decency, and good order in violation of Massachusetts General Laws chapter 272, section 105(c) (count IV), and intentional infliction of emotional distress (count V). First Am. Verified Compl. & Jury Demand ("Am. Compl.") 1, ECF No. 30.

When the Massachusetts State Police Department moved to dismiss, Def. Massachusetts State Police Department's Mot.

Dismiss Pls.' First Am. Verified Compl., ECF No. 31, this Court allowed the motion, holding that the Eleventh Amendment shields the Massachusetts State Police Department from suit, Wolski v. Gardner Police Dep't, 411 F. Supp. 3d 187, 194 (D. Mass. 2019).

The Gardner Police Department, McAvene, Travers, Wildgrube, and Prescott moved for summary judgment. Defs.' Mot.; Defs.' SOF; Def. Michael Travers' Mem. Law Supp. His Mot. Summ. J., ECF No. 89; Mem. Supp. Def. Danial Wildgrube's Mot. Summ. J., ECF No. 90; Def. Matthew Prescott's Mem. Law Supp. His Mot. Summ. J. ("Prescott's Mem."), ECF No. 91; Mem. Supp. Defs. Gardner Police Department & Lieutenant Eric McAvene's Mot. Summ. J., ECF No. 92. The Wolskis opposed the motion. Pls.' Opp'n Defs.' Joint Mot. Summ. J. ("Pls.' Opp'n"), ECF No. 101.

This Court held oral argument on July 8, 2021. See Elec. Clerk's Notes, ECF No. 111. When arguments concluded, this Court made several rulings. First, this Court dismissed the Gardner Police Department because it is not a suable entity, see Henschel v. Worcester Police Dep't, 445 F.2d 624, 624 (1st Cir. 1971), noting further that a motion for leave to amend the complaint to name the City of Gardner would be futile as to counts I and II and that this Court would decline to exercise supplemental jurisdiction over counts III, IV, and V, see 28 U.S.C. § 1367(c)(3). Second, this Court construed this civil action as an individual-capacity suit and not an official-

[7]

capacity suit. See Powell v. Alexander, 391 F.3d 1, 22 (1st Cir. 2004). Third, this Court allowed the motion for summary judgment as to McAvene, Travers, and Wildgrube on counts I and II and declined to exercise supplemental jurisdiction over counts III, IV, and V. See 28 U.S.C. § 1367(c)(3). Finally, this Court took the motion for summary judgment under advisement as to count I against Prescott, allowed it as to count II, and stated that it would not exercise supplemental jurisdiction over counts III, IV, and V if summary judgment were to enter for Prescott on count I. See id.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Materiality depends on the substantive law, and only factual disputes that might affect the outcome of the suit can preclude summary judgment. Id. In reviewing the evidence, this Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530

U.S. 133, 150 (2000) (citations omitted). This Court must also "disregard all evidence favorable to the moving party that the jury is not required to believe." Id. at 151. The moving party bears the initial burden of demonstrating that "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant does so, then the nonmovant must set forth specific facts sufficient to establish a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

**B.  42 U.S.C. § 1983 and Qualified Immunity**

42 U.S.C. § 1983 "provides a cause of action for the deprivation of constitutional rights by persons acting under color of state law." Torres v. Madrid, 141 S. Ct. 989, 994 (2021). "The doctrine of qualified immunity," however, "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quotations omitted). "Qualified immunity protects an officer from suit when a reasonable decision in the line of duty ends up being a bad guess -- in other words, it shields from liability all but the plainly incompetent or those who knowingly

violate the law." <u>Justiniano</u>, 986 F.3d at 26 (quotations omitted). "Reasonable mistakes . . . can be made as to the legal constraints on officers, and when that happens, the officer is qualifiedly immune from damages." <u>Id.</u> (brackets and quotations omitted).

To defeat the invocation of qualified immunity, a plaintiff must "show (1) that [the defendant] infracted [the plaintiff's] federal rights and (2) that these rights were so clearly established that a reasonable officer should have known how they applied to the situation at hand." <u>Id.</u> (quotations omitted). The second element is broken "down even more explicitly as follows: whether the right was clearly established at the time of the alleged violation, and whether a reasonable officer, similarly situated, would understand that the challenged conduct violated that established right." <u>Id.</u> (quotations omitted). A defendant has not "violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it, <u>i.e.</u>, existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate." <u>Id.</u> (citations and quotations omitted).

On a motion for summary judgment, courts "fram[e] the factual events according to summary judgment's traditional

[10]

leeway to the nonmoving party's version of events, and then ask[] whether, given that story, a reasonable officer should have known that his actions were unlawful." Id. (quotations omitted); see Ford v. Bender, 768 F.3d 15, 23 (1st Cir. 2014) ("A two-part framework governs whether a defendant is entitled to qualified immunity.  First, we inquire whether the facts, taken most favorably to the party opposing summary judgment, make out a constitutional violation.  Second, we inquire whether the violated right was clearly established at the time that the offending conduct occurred." (citation omitted)).

### 1. Constitutional Violation

The Wolskis fail to identify with consistency the basis for count I.  This led the parties to argue past each other, with Prescott arguing under the Fourteenth Amendment and the Wolskis arguing under the Fourth Amendment.[1]  This Court addresses each in turn.

#### i. Fourteenth Amendment

"The Supreme Court has implied that the Constitution might protect in some circumstances the individual interest in avoiding disclosure of personal matters from government infringement." Nunes v. Mass. Dep't of Correction, 766 F.3d 136, 143 (1st Cir. 2014) (quotations omitted); see Whalen v.

---

[1] The amended complaint mentions the First Amendment, Am. Compl. ¶ 34, but neither party advances any related argument.

Roe, 429 U.S. 589, 598 n.23 (1977) (explaining that the "right to privacy" recognized in Roe v. Wade, 410 U.S. 113 (1973), "is founded in the Fourteenth Amendment's concept of personal liberty" (quotations omitted)).

Even were this Court to assume, favorably to the Wolskis, that the intimate data are constitutionally protected, but see Davis v. Bucher, 853 F.2d 718, 719-21 (9th Cir. 1988) (holding that invasion of privacy claim based on public official's disclosure of intimate photographs sounds in tort and not under the Constitution); Carroll ex rel. Carroll v. Parks, 755 F.2d 1455, 1456-57 (11th Cir. 1985) (per curiam) (same), the flaw fatal to this claim is that there is no evidence that Prescott disclosed the intimate data. To the contrary, it is undisputed that after conducting the data extraction, Prescott returned Joseph Wolski's cell phone to him, left the Gardner Police Department, gave a copy of the data to Travers on a disc, did not copy or share the data again, and deleted the data from his laptop hard drive at the conclusion of the Arbolay case. Prescott Aff. ¶¶ 11-15.

The closest the record comes to supporting the Wolskis' narrative is that several Gardner Police Department officers heard about and discussed the intimate data. Pls.' SOF ¶¶ 39-41, 43. The Wolskis offer no legal support, however, for the proposition that this conduct implicates the Constitution.

[12]

Indeed, as the Wolskis seem to recognize, see Am. Compl. ¶ 35 (pleading, under count I, harm to personal and professional reputation) the better fit is under state law, see Fletcher v. Nebraska, 7:06cv5001, 2007 WL 9797656, at *3 (D. Neb. Feb. 28, 2007) (holding that 42 U.S.C. § 1983 claim based on public official's "spreading gossip" about the plaintiff "do[es] not state a federal cause of action and amount[s], at most, to [a] tort claim[] arising under state law"). To that end, in support of count I, the Wolskis cite Massachusetts General Law chapter 214, section 1B, the Commonwealth's right-of-privacy statute. Am. Compl. ¶ 34 (citing Mass. Gen. Laws ch. 214, § 1B). But 42 U.S.C. § 1983 applies only to federal statutory and federal Constitutional rights, not to state statutory or state constitutional rights. See Maine v. Thiboutot, 448 U.S. 1, 4 (1980). This Court ALLOWS the motion for summary judgment as to count I against Prescott to the extent that the Wolskis bring it for violation of the Fourteenth Amendment.

### ii. Fourth Amendment

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The Amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government, without regard to whether the government

actor is investigating crime or performing another function," such as "act[ing] in its capacity as an employer." City of Ontario v. Quon, 560 U.S. 746, 755-56 (2010) (quotations omitted).

"Although as a general matter, warrantless searches are per se unreasonable under the Fourth Amendment, there are a few specifically established and well-delineated exceptions to that general rule." Id. at 760 (quotations omitted). Under the "special needs" exception to the warrant requirement, "when conducted for a noninvestigatory, work-related purpose or for the investigation of work-related misconduct, a government employer's warrantless search is reasonable if" (1) "it is justified at its inception" and (2) "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the circumstances giving rise to the search." Id. at 760-61 (brackets, citations, and quotations omitted) (quoting O'Connor v. Ortega, 480 U.S. 709, 725-26 (1987) (plurality opinion)). "A determination of the standard of reasonableness applicable to a particular class of searches requires balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." O'Connor, 480 U.S. at 719 (brackets and quotations omitted).

[14]

The material facts are undisputed. Prescott does not contend that the data extraction was not a search, that the Wolskis did not have a reasonable expectation of privacy, or that he had a warrant. The Wolskis, for their part, fail to dispute that the Superior Court Order was the "noninvestigatory, work-related purpose" justifying the data extraction at its inception. See Quon, 560 U.S. at 761 (brackets omitted).

Here, the data extraction was unconstitutional because it was unreasonable in scope. See O'Connor, 480 U.S. at 726 (holding that "both the inception and the scope of the intrusion must be reasonable"). First, the Superior Court Order was limited to "notes or communications . . . generated . . . <u>during response to and investigation of</u> the incident that gave rise to this case," id. (emphasis added), yet Prescott conducted the data extraction on a cell phone that "wasn't even the same phone [Joseph Wolski] had used during [his] involvement with the Arbolay matter and the Racine interview -- [his] wife and [he] had upgraded since that time, and [he] didn't even think it had the same phone number." Aff. Pl. Joseph Wolski ¶ 15. Second, the data extraction went beyond the "notes or communications" contemplated by the Superior Court Order, reaching the intimate data in Joseph Wolski's locked photo album vault. Pls.' SOF ¶ 31. Prescott's "indiscriminate" extraction of "all the data stored on [Joseph Wolski's] personal cell phone" therefore was

[15]

excessively intrusive. See Larios v. Lunardi, 445 F. Supp. 3d 778, 784 (E.D. Cal. 2020), aff'd, No. 20-15764, 2021 WL 1997941 (9th Cir. May 19, 2021).

In Larios v. Lunardi, the United States District Court for the Eastern District of California, characterizing the question of excessive intrusion as "a question of fit," stated that although "[a] customized data withdrawal would have fallen squarely within the workplace inspection exception. . . . Downloading all the cell phone's data to retrieve a single thread of texts is like watering a plant with a firehose. The means far exceeds the need." Id. Larios explained that the Supreme Court's decision in Riley v. California, "though addressing distinct legal issues, provides a description of cell phones' storage capacity that helps illuminate the intrusiveness of the seizure in this case . . . ." Id. (citing 573 U.S. 373 (2014)). "[T]he possible intrusion on privacy is not physically limited in the same way when it comes to cell phones. . . . The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions . . . ." Riley, 573 U.S. at 394.

This is not to say that "only the least intrusive search practicable can be reasonable under the Fourth Amendment." See Quon, 560 U.S. at 763. Rather, this Court rules that where the personal cell phone searched was not the one used during the

[16]

Arbolay matter, and where the search reached into Joseph Wolski's locked photo album vault, the all-encompassing scope of the data extraction was disproportionate to the potential for finding "notes or communications" contemplated by the Superior Court Order, and therefore was unreasonable. See Quon, 560 U.S. at 761; O'Connor, 480 U.S. at 719; Lunardi, 445 F. Supp. 3d at 784.

### 2. Clearly Established

Having demonstrated that Prescott violated their Fourth Amendment rights, the Wolskis still must show that these rights were "clearly established at the time of the alleged violation" and that "a reasonable officer, similarly situated, would understand that the challenged conduct violated th[ese] established right[s]." See Justiniano, 986 F.3d at 26 (quotations omitted); see also Pearson, 555 U.S. at 243-44 ("An officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment. This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." (citation and quotations omitted)).

The Wolskis fail to make this showing. Their cited authorities concern excessive force, arrests, and cruel and unusual punishment. See Pls.' Opp'n 13-14. From that inapt

[17]

starting point, the Wolskis invite this Court to "take judicial notice that the Fourth Amendment in all circumstances is most clearly established law, as is the Wolski plaintiffs' Right of Privacy," and to rule that Prescott's conduct was so obviously unconstitutional that the Wolskis need not offer precedential support. See id. 14 (citing Hope v. Pelzer, 536 U.S. 730 (2002)). This Court declines both invitations, as it cannot delineate what is and is not clearly established at such "a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." See District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018) (quotations omitted). Particularly in the Fourth Amendment context, the right allegedly violated must be defined with "a high degree of specificity." Id. (quotations omitted). Simply pointing out that the Fourth Amendment exists and that courts sometimes permit "rare obvious case[s]" to go forward will not suffice. See id. (quotations omitted); Wilson, 526 U.S. at 615 ("It could plausibly be asserted that any violation of the Fourth Amendment is 'clearly established,' since it is clearly established that the protections of the Fourth Amendment apply to the actions of police. . . . However, as we explained in Anderson [v. Creighton, 483 U.S. 635 (1987)], the right allegedly violated

[18]

must be defined at the appropriate level of specificity before a court can determine if it was clearly established.").

If more were needed (it is not), recent caselaw indicates that the right allegedly violated here is not clearly established. Just a few months ago the Ninth Circuit held that this precise issue -- "whether it is unconstitutional to search or seize data from a personal cell phone under the workplace inspection exception to the warrant requirement for public employers established in O'Connor v. Ortega and City of Ontario v. Quon" -- is "not clearly established." Larios v. Lunardi, No. 20-15764, 2021 WL 1997941, at *1 (9th Cir. May 19, 2021) (nonprecedential). This Court rules that Prescott is qualifiedly immune and entitled to judgment as matter of law.

## III. CONCLUSION

For the foregoing reasons, this Court ALLOWS the motion for summary judgment, ECF No. 87, as to count I against Prescott. Judgment shall enter for the defendants.

**SO ORDERED.**

/s/ William G. Young
JUDGE
of the
UNITED STATES[2]

---

[2] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 43 years.